## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ESTATE OF JOHN MCCARTY,** *et al.* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No. 19-853 (RJL)** |
| | ) | |
| **ISLAMIC REPUBLIC OF IRAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**FILED**

DEC 2 8 2020

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

### MEMORANDUM OPINION
(December 28, 2020) [Dkt. # 24]

Plaintiffs are survivors of the terrorist hijacking of TWA Flight 847 from Athens, Greece on June 14, 1985, as well as immediate family members and estate representatives. Plaintiffs seek money damages against Iran for injuries and trauma caused by Iran's provision of material support to the hijackers pursuant to 28 U.S.C. § 1605A, the terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"). Having considered all of the record evidence, including the record in *Allan v. Islamic Republic of Iran*, No. 17-338, 2019 WL 2185037 (D.D.C. May 16, 2019), a predecessor case with identically situated plaintiffs, I find that plaintiffs here have similarly established grounds for default. Therefore, for the following reasons, I **GRANT** plaintiffs' motion for default judgment, *see* Plaintiffs' Motion for Default Judgment ("Pls.' Mot.") [Dkt. # 24], and also **GRANT** plaintiffs' request for relief totaling approximately $59 million dollars, consistent with the

1

findings of the appointed Special Master as to damages in *Allan*, which are equally applicable here.

## BACKGROUND

On June 14, 1985, two Hezbollah hijackers boarded TWA Flight 847 leaving Athens, Greece headed for Rome, Italy.  Amended Complaint ("Compl.") [Dkt. # 14] ¶ 18.  There were 143 passengers and 8 crewmembers on board at the time, 4 of whom are passenger plaintiffs in this case.  *Id.*  Shortly after takeoff, two hijackers armed with hand grenades commandeered the plane at gunpoint, *id.* ¶ 19, shouting, "Americans come to die!"  *Allan* at *1; Pls.' Mot. at 6 (citing evidence relied on in *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 80 (D.D.C. 2002)).[1]  They held the three pilots at gunpoint and ordered them to fly to Iran or Algeria.  Compl. ¶ 20; *see also* Pls.' Mot., Ex. D (*Stethem* Transcript, Testimony of Christian Zimmerman) ("Zimmerman Testimony")), at 123:14–124:19.  When informed that the plane did not have enough fuel to fly to either location, the hijackers instructed the pilots to land in Beirut, Lebanon.  Compl. ¶ 20.

What ensued was dramatic and terrifying. The hijackers forced some passengers into the First Class cabin and beat them repeatedly.  Pls.' Mot. at 6.  They began to single out passengers who they suspected of being U.S. Military or Jewish.  *Id.*, Ex. D (*Stethem* Transcript, Testimony of Clinton Suggs) ("Suggs Testimony")), at 87:1–90:23.   They

---

[1] For the reasons explained below, *infra* at 5, this Court will consider the factual findings and evidence presented in *Allan* and *Stethem*, both of which covered the same incident, and will reference testimony and declarations submitted in those cases, where necessary.

denigrated passengers' religions, ethnicities, nationalities, and countries of residence. Compl. ¶ 15. All seated passengers were forced to sit in a crash-landing position for hours at a time, and were beaten if they broke position. *Id.* ¶ 21. The terrorists landed the plane in Beirut hours after takeoff on June 14th. Pls.' Mot. at 7; *see also id.*, Ex. D (Zimmerman Timeline) at 124. They demanded the release of nearly 800 prisoners in Israel and Kuwait. Compl. ¶ 22. In exchange for fuel, they released several women and children. Pls.' Mot. at 7.

The hijackers then ordered the pilots to fly the plane to Algiers, Algeria. Compl. ¶ 23. After refueling again, they ordered the pilots to return to Beirut. *Id.* ¶ 23–24. The airport authorities ordered the plane not to land, and placed obstacles on the runway to enforce the order. *Id.* ¶ 24. Despite the dangerous conditions, the pilots were able to safely land on the runway. *Id.* On the ground in Beirut for a second time, the hijackers demanded that additional terrorists be allowed to board. *Id.* ¶ 25. They executed one passenger—a navy diver named Robert Stethem—and tossed his body onto the tarmac. *Id.* Later that day, ten additional militiamen from the Amal group and one Hezbollah spokesman boarded the plane. *Id.*; Pls.' Mot., Ex. D (Zimmerman Timeline) at 126. The plane then headed back to Algeria for a second time. *Id.* ¶ 26. During this period, the hijackers began ramping up their harassment and abuse—threatening passengers with execution, beating them, and robbing them of all their belongings. *Id.* ¶ 26–27; Pls.' Mot., Ex. B (Pls.' Decls.) at 24, 26, 62, 74. Certain other passengers were released during these stops. Compl. ¶ 27.

On the morning of June 16, the hijackers ordered the plane back to Beirut for a third

time. *Id.* ¶ 26.  At that point, the passengers still on board had endured 72 hours on the aircraft with inadequate food, water, access to bathroom facilities, or sleep.  *Id.*  The plane sat on the tarmac until the next morning, when the remaining passengers were removed from the plane and taken into Beirut.  *Id.* ¶ 27.  For the next two weeks, the men were threatened, vilified, and caused to believe that they would be excuted by a firing squad. Compl. ¶ 27.  The terrorists finally released the Beirut hostages to Syrian military personnel on June 30, 1985.  *Id.* ¶ 28.  The hijackers were indicted for their roles in the hijacking, but never taken into United States custody.  *See* Pls.' Mot. at 12.

Plaintiffs filed this action on March 26, 2019.  On January 15, 2020, plaintiffs served Iran via diplomatic channels.  Iran never accepted service, so the Clerk of the Court entered default on March 22, 2020.  On May 1, 2020, plaintiffs moved for default judgment and damages.

## ANALYSIS

### I.    Iran is Liable Under the FSIA's Terrorism Exception—28 U.S.C. § 1605A

Plaintiffs argue that Iran should be held liable under the FSIA's terrorism exception, 28 U.S.C. § 1605A, for providing material support to the terrorist groups that perpetrated the 1985 hijacking incident aboard TWA Flight 847.  I begin by noting, as I did in *Allan*, that this is not the first time the events at issue have been the subject of a suit under the FSIA.  In 2002, Judge Thomas Penfield Jackson ("Judge Jackson") granted default judgment in two consolidated cases involving the same 1985 hijacking incident under an older provision of the FSIA, § 1605(a)(7).  *See Stethem v. Islamic Republic of Iran,* 201 F.

Supp. 2d 78, 85 (D.D.C. 2002). The two consolidated cases before Judge Jackson included the individual who was killed on the plane, Robert Stethem, as well as his surviving family members.[2]  On May 16, 2019, I granted default judgment for plaintiffs in *Allan v. Islamic Republic of Iran*, a case involving plaintiffs identically situated to plaintiffs in the instant case.[3]  Keeping in mind that "the FSIA does not require this Court to relitigate issues that have already been settled," I find, as I did in *Allan*, that there are grounds to take judicial notice of these "related proceedings and records in cases before the same court." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009) (quoting *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d. 229, 263 (D.D.C. 2006) (internal quotation marks omitted)); *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 60 (D.D.C. 2010) ("[T]he Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence.").

I will therefore grant plaintiffs' request to take judicial notice of the entire record submitted, and adjudicative findings of fact reached, in *Allan* and *Stethem*, and to apply in the instant case the damages benchmarks recommended by Special Master Alan Balaran, who I appointed in *Allan* to make findings on the *Allan* plaintiffs' motion for default as to damages.  Pls.' Mot. on Liability at 2.

To find default judgment for the plaintiffs, I must first determine whether I have jurisdiction under the FSIA.  Section §1605A(a)(1) imposes three requirements to establish

---

[2] None of the *Stethem* plaintiffs are plaintiffs in the instant case.
[3] None of the *Allan* plaintiffs are plaintiffs in the instant case.

subject matter jurisdiction: 1) that the claims be against a foreign state that was designated a state sponsor of terrorism at the time the acts occurred, § 1605A(a)(2)(A)(i); 2) that plaintiffs be U.S. nationals at the time the acts occurred, § 1605A(a)(2)(A)(ii); and 3) that plaintiffs be seeking money damages for personal injury or death caused by the foreign state's acts of torture, extrajudicial killing, aircraft sabotage, and hostage taking, or by the foreign state's provision of material support or resources for such acts. § 1605A(a)(1); *see also Owens v. Republic of Sudan,* 864 F.3d 751, 778 (D.C. Cir. 2017). Having considered the record evidence, I find that plaintiffs satisfy each of these requirements in the instant case.

### A. Iran Was a State Sponsor of Terrorism at the Time of the Hijacking

First, as plaintiffs argue, Iran was designated a state sponsor of terrorism on January 19, 1984, and remained a designated state sponsor of Hezbollah at the time of the hijacking. *See* Pls.' Mot., Ex. D (Statement of U.S. Secretary of State, 49 Fed. Reg. 2836-02); *Stethem*, 201 F. Supp. 2d at 85 (relying on evidence that Iran is the "patron state" of Hezbollah); Pls.' Mot., Ex. D (Clawson Expert Report) at ¶¶ 23, 38–39, 51 (Iran committed substantial support to fund Hezbollah's acts of "terrorism as an official means of forwarding foreign policy" in the early 1980s); *see also Allan* at *3.

### B. Plaintiffs Meet the Requirements of U.S. Citizenship

Second, the record shows that all of the passenger plaintiffs were U.S. citizens at the time of the hijacking. *See* Pls.' Mot. at 22; Pls.' Mot., Ex. B (Pls.' Decls.) (attaching citizenship documents).

### C.  Iran Provided Material Support to the Terrorist-Hijackers

Finally, plaintiffs are seeking "money damages ... against [Iran] for personal injury or death that was caused by an act of torture . . . aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . ." FSIA § 1605A(a)(1).  In *Stethem*, Judge Jackson determined that Iran had indeed provided "material support" to Hezbollah and Amal for the hijacking and hostage taking, including funding, training, logistical and weapons support, and professional guidance and tactical expertise.  201 F. Supp. 2d at 87 ("[A]s the Court has previously found in so many similar cases before it, the evidence conclusively establishes that the Islamic Republic of Iran and its MOIS provided 'material support or resources' to Hizballah, and Hizballah and its co-conspirator Amal were the perpetrators of these heinous acts of terrorism.").  Because the FSIA did not provide an independent federal cause of action at the time of *Stethem*, plaintiffs had to prove that they met the elements of their D.C. state law claims (in that case, wrongful death and survival claims), and additionally had to prove that the court had jurisdiction under the FSIA.  *Id.* at 87–88.

In 2008, however, Congress replaced § 1605(a) with § 1605A and created a private, federal cause of action against foreign governments in § 1605A(c) so that plaintiffs are no longer required to prove state law claims to secure relief.  *See Owens*, 864 F.3d at 765. However, the causation requirement—that plaintiff's injury result from material support of acts of terrorism—has not changed, and the language in § 1605A(a)(2) largely mirrors the prior language in § 1605(a)(7).  *Owens*, 864 F.3d at 796–99.  Most courts have interpreted

this so-called "jurisdictional causation" requirement loosely, finding that where a foreign government's support of terrorist activities could be shown generally, plaintiffs need not prove whether the government had "provided material support and resources that caused *this particular act.*" *See Shoham v. Islamic Republic of Iran*, No. 12-cv-508, 2017 WL 2399454, at *10, 16-17 (D.D.C. June 1, 2017) (internal quotation marks omitted); *Owens*, 864 F.3d at 794–99 (finding jurisdictional causation where defendant-Sudan provided safe harbor and preferential tax treatment to al Qaeda, despite Sudan's ignorance of al Qaeda's specific plans to launch attacks on US embassies in Africa). Having considered the record evidence in this case, I find, consistent with Judge Jackson's opinion in *Stethem* and my prior opinion in *Allan*, that Iran provided "material support" to terrorist groups Hezbollah and Amal sufficient to meet the requirements of § 1605A(a)(1).

### D. Plaintiffs Suffered Personal Injuries as a Result of the Hijacking

It still remains for me to consider whether the 4 passengers and 36 immediate family members of passengers who bring this lawsuit have adequately met the statutory requirement of *personal injury* in the instant case. § 1605A(a)(1). Having considered the record evidence, and incorporating my findings of fact in *Allan*, I find that they do. Like in *Allan*, it is clear from plaintiffs' declarations that they have all established valid theories of recovery for assault, battery, false imprisonment, and intentional infliction of emotional distress. And even more clear is the fact that "plaintiffs' personal injuries arise from their having been taken hostage and tortured by agents of the defendant[ ]." *Stethem*, 201 F. Supp. 2d at 91 n. 20.

8

Plaintiffs' declarations in both *Allan* and the instant case paint a harrowing tale of the events that transpired aboard TWA Flight 847, as well as the conditions of captivity for some passengers for two weeks afterwards in Beirut.  Even those only on the aircraft for the first day of the siege were forced to sit for prolonged periods in a crash-landing position; refused access to food and water; prevented from using lavatories; and either subjected to or witness to abuse by their captors.  *See* Pls.' Mot., Ex. D (*Stethem* Transcript (Zimmerman Testimony)), at 127:4-10; *id.*, Ex. B (Pls.' Decls.).  One passenger plaintiff recalled "los[ing] track of time" in the crash-landing position and being struck repeatedly with a gun for breaking position.  Pls.' Mot., Ex. B (Pls.' Decls.) at 72.  Some passengers were also questioned about race, religion, and occupation for the purpose of being singled out for potential execution.  *Id.*, Ex. D (*Stethem* Transcript, Suggs Testimony), at 88:1–8, 91:4–6.  In many cases, moreover, passengers travelling with family members faced the additional terror of watching close family be subjected to such abuse.  *See, e.g.*, *id.*, Ex. B (Pls.' Decls.) at 73-74.  And, of course, for about a third of the passengers, the terror did not end with the plane made its final stop in Beirut.  Twenty-three male passengers endured an additional two weeks of captivity in Beirut, during which they were subjected to mock executions, threatened, and held under deplorable conditions.  Compl. ¶ 27.

As for the family member "spouse[s], parents, siblings, and children," *Heiser*, 659 F. Supp. 2d at 28, their declarations "alleging emotional distress arising from a terrorist attack that killed or injured a family member," clearly satisfy Section 1605A's jurisdictional injury requirement, even though many were not present at the scene. *Owens*,

864 F.3d at 812 (certifying question of presence requirement for IIED claims to D.C. Court of Appeals); *Republic of Sudan v. Owens*, 194 A.3d 38, 45 (D.C. 2018) ("We see little need to enforce the presence requirement in IIED cases where the jurisdictional elements of § 1605A are satisfied and the plaintiff's severe distress arises from a terrorist attack that killed or injured a member of his or her immediate family."). Indeed, as I explained in *Allan*, the "'intent to create maximum emotional impact,' particularly on third parties, is terrorism's *raison d'être*." *Heiser*, 659 F. Supp. 2d at 27 (quoting *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000)); *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 344 (D.D.C. 2016) ("Claims for solatium under the FSIA are nearly indistinguishable from claims for intentional infliction of emotional distress.").

Plaintiffs have therefore established all of the jurisdictional requirements laid out by Section 1605A(a).[4] What remains for me to consider is whether plaintiffs have met Section 1605A(c)'s requirement to state a "theory of liability" on which defendants can be held liable for plaintiffs' injuries. Fortunately for them, they have!

---

[4] The FSIA terrorism exception contains a limitation period, which provides that an action must be brought not later than the latter of (1) 10 years after April 24, 1996; or (2) 10 years after the date on which the cause of action arose unless plaintiffs have timely commenced a "related" or "prior action" under the old § 1605(a)(7). 28 U.S.C. § 1605A(b). Under this limitations provision, the last day to file a new action under § 1605A was April 24, 2006. Nevertheless, our Circuit has unequivocally stated that the limitations provision in the FSIA's terrorism exception is *non-jurisdictional*. *Owens*, 864 F.3d at 802 ("[n]othing in § 1605A(a) 'conditions its jurisdictional grant on compliance with [the] statute of limitations' in § 1605A(b)") (quoting *Musacchio v. United States*, 136 S.Ct. 709, 717 (2016)). Therefore, where defendants do not raise it as an affirmative defense, it is considered waived unless courts exercise their discretionary authority to raise the limitation as a defense *sua sponte*. *See Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 331

As stated above, plaintiffs here have submitted a voluminous record, including the entire record in *Allan* and fulsome declarations by the instant plaintiffs alleging tort claims for assault, battery, false imprisonment, and the intentional infliction of emotional distress, all "well-established principles of law, such as those found in the Restatement (Second) of Torts..." *Worley*, 75 F. Supp. 3d at 335. While the FSIA technically requires plaintiffs "to prove a theory of liability" separate and apart from establishing the elements of subject matter jurisdiction, *Owens*, 864 F.3d at 807, most courts conduct the analysis together, since evidence sufficient to establish jurisdictional causation will almost always establish a theory of "personal injury" necessary to prevail under §1605A(c). *See, e.g., Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017) (finding that plaintiffs were entitled to relief under Section 1605A(c) after proving Section 1605A(a)'s jurisdictional requirements because of the "the overlap between the elements of this cause of action and

---

(D.D.C. 2014) ("declin[ing] whatever discretionary authority [the Court] may have to raise the defense of limitations on Iran's behalf"); *cf. Maalouf v. Islamic Republic of Iran*, 306 F. Supp. 3d 203, 212 (D.D.C. 2018) ("Considering the timeliness of an FSIA claim sua sponte is a discretionary determination."). Recognizing that the FSIA strikes a "careful balance" between comity and accountability, *see Rubin v. Islamic Republic of Iran*, 138 S.Ct. 816, 822 (2018), I decline to exercise my discretion to raise the timeliness defense here for several reasons. First, defendants have, so far, chosen not to appear in this or related litigation and raise the limitations defense. There is little argument for comity, as Iran remains a state sponsor of terrorism, and no friend of the United States. And plaintiffs raise claims related to the very factual circumstances under which Judge Jackson previously granted relief to the passenger who was killed during the hijacking. Moreover, the D.C. Circuit's overview of the textual history of the limitations provision in *Owens* clearly demonstrates that Congress did not intend for courts to consider the limitation as a bar to jurisdiction, but rather to consider the timeliness issue on a case-by-case basis. 864 F.3d at 802–04.

the terrorism exception to foreign sovereign immunity"); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) (summarily concluding that Section 1605A(c)'s cause of action requirement is satisfied when Section 1605A(a) jurisdiction is found). Because "plaintiffs' personal injuries arise from their having been taken hostage and tortured by agents of the defendants[,]" I need not "belabor the issue of liability by addressing the independent elements of each separate tort claim advanced by [each of] the plaintiffs." *Stethem*, 201 F. Supp. 2d at 91 n. 20.

## II. Compensatory Damages Should be Awarded Consistent with the *Allan* Special Master's Recommendation

Plaintiffs also seek an order awarding compensatory damages. A party seeking default damages under the FSIA "must prove damages 'in the same manner and to the same extent as any other default winner.'" *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 243 (D.D.C. 2012) (quoting *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 160 (D.D.C. 2009)). Plaintiffs may meet this burden of proof by submitting "affidavits or declarations rather than through live witnesses testifying in open court," *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 20 (D.D.C. 2009), which the Court "may accept…as true." *Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 163 (D.D.C. 2013).

While putting a price tag on the pain and suffering of passengers and their families is challenging, *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017) (recognizing the "challenge aris[ing] in assigning a dollar value to such pain and

suffering"),  there are, fortunately, a plethora of prior decisions in this Circuit awarding damages for pain and suffering to victims of terrorist attacks.  Indeed, the Special Master in *Allan* diligently considered these decisions, and devised a framework by which to group the *Allan* plaintiffs' injuries in a way that is both consistent with prior practice and internally consistent between plaintiffs.  *See* Pls.' Mot., Appendix A (Pls.' Proposed Findings of Fact and Conclusions of Law) at 14-16.  Namely, he considered the severity of the pain immediately following the injury, the lasting and severe psychological problems resulting from the injuries, and the overall length and severity of captivity.  This framework applies equally to the plaintiffs here, who are situated identically to the plaintiffs in *Allan*.

Starting with "the baseline assumption that persons suffering [physical] injuries in terrorist attacks are entitled to $5 million in compensatory damages," *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012), and that those who suffer emotional, but no physical injury are typically awarded $1.5 million in damages, *see, e.g.*, *Relvas v. Islamic Republic of Iran*, Case No. 14-01752, 2018 WL 1092445, *2 (D.D.C. Feb. 28, 2018), the Special Master in *Allan* divided plaintiffs in that case according to the "gravity of harm" as revealed by their "shared experiences." *See Allan* at 6.  Plaintiffs in the instant case ask that I apply Special Master Balaran's recommended damages benchmarks to plaintiffs' damages evidence here. Pls.' Mot. at 2.  In *Allan*, I fully adopted the damages framework recommended by Special Master Balaran because, as plaintiffs note, it was both fair and practical, and was well-supported by decisions in other terrorism cases involving the same or very similar issues.  Because plaintiffs in the instant case are situated identically

13

to the plaintiffs in *Allan* and because the damages benchmarks apply here in full force, I agree that the most fair and efficient way forward is to apply the *Allan* damages framework here.

For passenger plaintiffs, the Special Master recommended relief under three sub-categories:   For the 15 passengers ("Group I") who were "forced to sit for prolonged periods in cramped and painful positions; refused access to the lavatories; subjected to unsanitary conditions; denied food and water; and were subjected to or forced to watch mock executions," but were ultimately released within the first day of the hijacking, he awarded $1,000,000. *Allan* at *7. For the 27 passengers ("Group II") who were "subjected to 35 additional hours of the same abuse," and also "faced a possible crash-landing; heard the gunshot that killed a fellow passenger; listened while other passengers were brutally beaten; saw the swollen and bloodied bodies of the terrorists' victims; capitulated to the demands of heavily-armed Amal militia; [were] robbed of their valuables; and watched helplessly as their captors wired the aircraft with plastic explosives," the Special Master awarded $2,000,000. *Id.*  And for the 23 passengers ("Group III") who were held captive in Beirut for an extra two weeks and suffered additional abuse, including being "lined up against a wall—'execution-style'; repeatedly threatened with death; tormented with false promises of release; housed in locations surrounded by exploding shells and mortar fire; confined to rooms with no beds, working toilets or sanitary facilities; supplied with tainted food and water; and bombarded with anti-American propaganda," he awarded $5,000,000. *Id.*

Special Master Balaran conducted a separate analysis to determine the appropriate baseline loss of solatium for family members whose loved ones "survived a terrorist attack." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 n. 10 (D.D.C. 2011); *see also Wyatt*, 908 F. Supp. 2d at 232 (finding loss of solatium framework applied to "cases in which the victim survived a terrorist attack or hostage-taking"). Keeping in mind the principle that family members should not be awarded more than the victim, and considering analogous cases in our Circuit, the Special Master recommended solatium awards for family members of victims commensurate with the groups above—for Group I, $660,000 for spouses, $560,000 for parents, $495,000 for children, and $330,000 for siblings; for Group II, $1,330,000 for spouses, $1,112,000 for parents, $990,000 for children, and $660,000 for siblings; and for Group III, $4,000,000 for spouses, $2,500,000 for parents, $1,500,000 for children, and $1,250,000 for siblings. *Allan* at *7.

Under these circumstances, plaintiffs are thus entitled to compensatory damages in the amounts listed above.[5] I therefore GRANT plaintiffs' motion for default judgment as to damages consistent with these amounts, as set forth in detail in the attached Appendix A–Damages, and totaling approximately $59 million dollars.

---

[5] Notably, the Special Master's recommended awards were within the range granted by Judge Jackson in *Stethem*. 201 F. Supp. 2d at 93 (awarding $5,000,000 each to the Stethem and his wife, and a range of $200,000 to $3,000,000 to other family members).

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** plaintiffs' motion default judgment and damages [Dkt. # 24].   An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

16

## APPENDIX A—DAMAGES

| Plaintiff | Hostage/ Relationship | Pain & Sufferings | Solatium | Total |
|---|---|---|---|---|
| **FAMILY OF GROUP III HOSTAGE VICTOR AMBURGY** <br> **(Received Judgment in *Allan, et al. v. Islamic Republic of Iran*)** | | | | |
| Amburgy, Donald (Estate of ) | Father of Group III Hostage | $0 | $2,500,000 | $2,500,000 |
| Amburgy, Ethelyn (Estate of) | Mother of Group III Hostage | $0 | $2,500,000 | $2,500,000 |
| Amburgy, Lawrence | Brother of Group III Hostage | $0 | $1,250,000 | $1,250,000 |
| Damrow, Mary | Sister of Group III Hostage | $0 | $1,250,000 | $1,250,000 |
| Jagla, Linda | Sister of Group III Hostage | $0 | $1,250,000 | $1,250,000 |
| Kruse, Patricia | Sister of Group III Hostage | $0 | $1,250,000 | $1,250,000 |
| McCarty, Jack (Estate of) | Group III Hostage; Spouse of Group III Hostage | $5,000,000 | $4,000,000 | $9,000,000 |

| FAMILY OF GROUP III HOSTAGE JEROME BARCZAK | | | | |
|---|---|---|---|---|
| **(Received Judgment in *Allan, et al. v. Islamic Republic of Iran*)** | | | | |
| Barczak, Alice | Sister of Group III Hostage | $0 | $1,250,000 | $1,250,000 |
| Barczak, Carol | Sister of Group III Hostage | $0 | $1,250,000 | $1,250,000 |
| Barczak, David | Son of Group III Hostage | $0 | $1,500,000 | $1,500,000 |
| Barczak, Edward | Brother of Group III Hostage | $0 | $1,250,000 | $1,250,000 |
| Barczak, James | Son of Group III Hostage | $0 | $1,500,000 | $1,500,000 |
| Barczak, Lenore | Sister of Group III Hostage | $0 | $1,250,000 | $1,250,000 |
| Barczak, Michael | Brother of Group III Hostage | $0 | $1,250,000 | $1,250,000 |
| Barczak, Michael "Mike" | Son of Group III Hostage | $0 | $1,500,000 | $1,500,000 |
| Day, Marianne | Sister of Group III Hostage | $0 | $1,250,000 | $1,250,000 |
| Goodmann, Sharon | Sister of Group III Hostage | $0 | $1,250,000 | $1,250,000 |
| Kiepe, Diane | Daughter of Group III Hostage | $0 | $1,500,000 | $1,500,000 |
| Olson, Susan | Sister of Group III Hostage | $0 | $1,250,000 | $1,250,000 |
| Thornley, Joan | Sister of Group III Hostage | $0 | $1,250,000 | $1,250,000 |

2

| FAMILY OF GROUP I HOSTAGE JUDITH CHUDIGIAN (Received Judgment in *Allan, et al. v. Islamic Republic of Iran*) | | | | |
|---|---|---|---|---|
| Chudigian, Lavom (Estate of) | Husband of Group I Hostage | $0 | $660,000 | $660,000 |
| Cote, Sue | Daughter of Group I Hostage | $0 | $495,000 | $495,000 |
| Rogers, Diane | Daughter of Group I Hostage | $0 | $495,000 | $495,000 |

| FAMILY OF GROUP III HOSTAGE GEORGE LAZANSKY & GROUP II HOSTAGE JOANNE LAZANSKY* (Received Judgment in *Allan, et al. v. Islamic Republic of Iran*) *Individuals with multiple family members on board TWA 847 received solatium damages corresponding to the family member held captive the longest amount of time. | | | | |
|---|---|---|---|---|
| Lazansky, Michael | Son of Group III Hostage | $0 | $1,500,000 | $1,500,000 |
| Lazansky, Pete | Son of Group III Hostage | $0 | $1,500,000 | $1,500,000 |
| Lazansky, Thomas | Son of Group III Hostage | $0 | $1,500,000 | $1,500,000 |

| GROUP I HOSTAGE FRANCES REYNOLDS AND FAMILY | | | | |
|---|---|---|---|---|
| DuCharme, June | Daughter of Group I Hostage | $0 | $495,000 | $495,000 |
| Reynolds, Frances (Estate of) | Group I Hostage | $1,000,000 | $0 | $1,000,000 |

3

| GROUP II HOSTAGE PAULA SUKEFORTH AND FAMILY | | | | |
|---|---|---|---|---|
| Bellino, Catherine | Daughter of Group II Hostage | $0 | $990,000 | $990,000 |
| Donegan, Lisa | Daughter of Group II Hostage | $0 | $990,000 | $990,000 |
| Johnson, Leslie | Daughter of Group II Hostage | $0 | $990,000 | $990,000 |
| McDonough, Ann | Daughter of Group II Hostage | $0 | $990,000 | $990,000 |
| Stevens, Frank (Estate of) | Father of Group II Hostage | $0 | $1,112,000 | $1,112,000 |
| Sukeforth, Carl | Son of Group II Hostage | $0 | $990,000 | $990,000 |
| Sukeforth, Harold (Estate of) | Husband of Group II Hostage | $0 | $1,330,000 | $1,330,000 |
| Sukeforth, Paul | Son of Group II Hostage | $0 | $990,000 | $990,000 |
| Sukeforth, Paula | Group II Hostage | $2,000,000 | $0 | $2,000,000 |

4

| PLAINTIFFS WITHOUT FAMILY GROUPS IN THIS CASE | | | | |
|---|---|---|---|---|
| Delgado, Jose (Estate of) | Group II Hostage; Spouse of Group I Hostage Gisela Delgado (Received Judgment in *Allan, et al. v. Islamic Republic of Iran*) | $2,000,000 | $660,000 | $2,660,000 |
| O'Meara, Kiley | Daughter of Group II Hostage Frank Walsh (Received Judgment in *Allan, et al. v. Islamic Republic of Iran*) | $0 | $990,000 | $990,000 |
| Zinna, Lynette | Sister of Group II Hostage Judy Cox Barkley (Received Judgment in *Allan, et al. v. Islamic Republic of Iran*) | $0 | $660,000 | $660,000 |